IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Lee A. Donaldson, | ) |
| Plaintiff, | ) |
| vs. | ) Civil Action No. 09-804 |
| Informatica Corporation, | ) |
| Defendant. | ) |

AMBROSE, Senior District Judge

# OPINION
## and
## ORDER OF COURT

In this diversity case, Plaintiff Lee A. Donaldson ("Plaintiff" or "Donaldson") brings a state law wrongful discharge claim against Defendant Informatica Corporation ("Defendant" or "Informatica"). Specifically, Plaintiff contends that Informatica unlawfully terminated his employment in retaliation for his filing a prior lawsuit against Informatica under Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. § 260.1, *et seq.* Pending before the Court is Defendant's Motion for Summary Judgment. (Docket No. 47). Also pending is Defendant's Motion to Strike Certain Exhibits/Charts to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. (Docket No. 59). Plaintiff opposes both motions. After careful review of the submissions by the parties and for the reasons discussed in this Opinion, the Motion for Summary Judgment is granted and the Motion to Strike is denied as moot.

### I. BACKGROUND

#### A. Factual Background

Unless otherwise indicated, the following facts are undisputed.

1

### 1. Donaldson's Employment with and First Lawsuit Against Informatica

Informatica, headquartered in Redwood City, California, produces a sophisticated software platform that integrates data from a variety of different software platforms so that all users can access the entire body of data from the various software platforms. Informatica hired Plaintiff Donaldson as a Major Account Manager in February 2005. As a Major Account Manager (also referred to as a District Sales Manager or "DSM"), Donaldson sold Informatica's software products to specific end users or accounts in an assigned region of the United States.

On or about May 5, 2008, Donaldson filed a Complaint against Informatica in this Court (the "First Lawsuit"), alleging several claims including an alleged violation of the Pennsylvania Wage Payment and Collection Law arising out of a commission dispute over a sale to Dell, Inc. that closed in March 2008. On November 30, 2009, I issued an Opinion and Order granting Defendant's Summary Judgment Motion and dismissing Plaintiff's First Lawsuit in its entirety. On January 14, 2010, Plaintiff filed an appeal with the United States Court of Appeals for the Third Circuit. On March 28, 2011, the Court of Appeals issued an Opinion affirming my dismissal of Plaintiff's First Lawsuit. See Donaldson v. Informatica, Civ. A. No. 08-605 (Docket No. 107).

### 2. Plaintiff's First Performance Improvement Plan

On November 10, 2008, Donaldson was placed on a Performance Improvement Plan ("PIP"). As of the date of his November 10, 2008 PIP, Donaldson had delivered only $99,608 in sales against his second quarter 2008 quarterly quota of $650,000. As of that same date, Donaldson had delivered only $229,225 against his third quarter 2008 quarterly quota of $650,000. As of November 2008, Donaldson had achieved only 38.7% of his annual quota for the year.[1]

As part of his first PIP, Donaldson was assigned the following goals: (i) close $813,467 of

---

[1] Donaldson admits this fact but disputes the materiality of the statistic on the grounds that it measures a partial year's performance against a full year quota.

net license revenue by December 31, 2008 (which would have placed him at 70% of his annual quota); (ii) add an additional $342,000 of net license revenue to his first quarter 2009 pipeline[2] in order to achieve his quarterly pipeline goal of $2,405,000; (iii) attend a minimum of two customer/prospect meetings each week; (iv) complete opportunity forms for three particular deals; and (v) thoroughly update PowerCafe with pertinent information. Donaldson's first PIP also stated:

> The management team wants you to be successful at Informatica and will actively support you in helping you achieve these goals. However, if your performance in the areas outlined above does not improve significantly and measurably, and the actions noted are not completed in the times, you will be subject to further disciplinary action or termination or employment with Informatica.

Donaldson Dep. Ex. 2 (Docket No. 50, Tab G). Donaldson was given until December 31, 2008 to achieve the stated goals. Donaldson did not meet the revenue goal in his first PIP nor did he meet his typical $650,000 quarterly revenue goal.

### 3. **Plaintiff's Second Performance Improvement Plan**

Even though Donaldson did not satisfy the objectives in his first PIP, Informatica did not discharge him. Instead, Donaldson was placed on a second PIP on January 29, 2009. Donaldson was told that he was being placed on a second PIP because he did not meet the objectives of his first PIP. Donaldson was assigned the following goals in his second PIP: (i) deliver $650,000 in net license revenue in the first quarter 2009; (ii) attend and actively contribute in all company meetings and corporate functions; (iii) maintain a positive working relationship with all customers and Informatica employees; (iv) continue weekly face-to-face meetings with at least two customer/prospects and one partner; (v) continue keeping PowerCafe up to date; (vi) generate a pipeline of $2,405,000 for the second quarter of 2009; (vii) generate $1,000,000 in new pipeline regardless of close date; (viii) complete and keep all opportunity forms over

---
[2] Pipeline is the aggregate of sales opportunities created within a particular sales territory and represents the estimated dollar value of potential transactions. Pipeline is estimated and submitted by DSMs to the Company.

$200,000 up to date; (ix) actively pursue answers to all gaps/unanswered questions posed by sales management; (x) complete detailed close plans for all deals over $200,000 by February 16, 2009; and (xi) do not be single threaded – validate and triangulate what is learned to have discussions with customers higher in the chain of command. The second PIP also stated:

> If you successfully over-achieve your Q1 quota of $650,000 either before or at the end of the specified timeframe, then this plan will cease to be in effect. However, your performance will be monitored on an ongoing basis, with objectives set on a monthly and/or quarterly basis to ensure a sustained improvement. If you do not achieve your Q1 quota or there is any decrease in performance after successfully over-achieving your Q1 quota, it may result in you being dismissed from Informatica without the issuance of another warning or improvement plan.

Donaldson Dep. Ex. 4 (Docket No. 50, Tab G).

The $650,000 net license revenue goal on the second PIP was the typical quarterly net license revenue goal for DSMs, and the pipeline goal was consistent with the typical quarterly pipeline goal for DSMs. Donaldson, however, closed only $20,000 in the first quarter of 2009.

### 4. Plaintiff's Third Performance Improvement Plan and Discharge

Informatica did not discharge Donaldson following his failure to meet all of the goals of his second PIP; rather, Informatica placed Donaldson on a third PIP in May 2009. Donaldson was assigned the following goals in his third PIP: (i) close $825,000 in revenue by May 30th; (ii) continue keeping PowerCafe accurate and up to date; (iii) respond to all phone and e-mail requests within 24 hours; (iv) generate $494,000 in new pipeline by May 30th regardless of close date; (v) complete and keep all Opportunity Forms over $200,000 accurate and up-to-date; (vi) actively pursue getting answers to all gaps/unanswered questions from sales management; (vii) complete detailed close plans; and (viii) leverage the information learned to pitch top accounts. The PIP also stated: "If you are unable to achieve all of the performance criteria above, your employment at Informatica may conclude on May 30th. However, if you are able to achieve the performance measures above, Informatica reserves the right to issue another performance improvement plan to ensure consistent ongoing performance." Donaldson Dep. Ex. 7 (Docket

No. 50, Tab G). Donaldson did not meet the objectives of his third PIP. At the close of the third PIP, Informatica decided to terminate Donaldson's employment, and on May 30, 2009, Donaldson was informed of his discharge which was effective June 2, 2009.

### B. Procedural History

On July 13, 2009, Plaintiff filed an Amended Complaint in this action against Defendant Informatica. (Docket No. 2). Informatica filed an Answer to the Amended Complaint on August 31, 2009. (Docket No. 4). On October 26, 2010, Informatica filed its Motion for Summary Judgment and supporting materials. (Docket Nos. 47-50). Plaintiff filed a Brief in Opposition, Counterstatement of Facts, and Appendix on November 26, 2010. (Docket Nos. 53-55). Informatica filed a Reply Brief, a Response to Plaintiff's Concise Statement of Material Facts, and a Supplemental Appendix on December 16, 2010. (Docket Nos. 56-58). Plaintiff filed a Sur-Reply Brief on January 5, 2011. (Docket No. 65). On April 18, 2001, with leave of Court, Informatica filed a Supplemental Brief in Support. (Docket No. 69). Plaintiff filed a Supplemental Brief in Response on April 27, 2011. (Docket No. 71). Also, on December 16, 2010, Informatica filed a Motion to Strike portions of Plaintiff's Appendix. (Docket No. 59). Plaintiff filed a Brief in Opposition to the Motion to Strike on January 5, 2011. (Docket No. 66). Both motions are now ripe for my review.

## II. LEGAL ANALYSIS

### A. Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988) (quoting Celotex, 477 U.S. at 322).

With this standard in mind, I turn now to the issues of this case.

### B. Defendant's Motion for Summary Judgment

#### 1. Wrongful Discharge – Viability of Claim

Donaldson's sole claim in this case is that Informatica violated Pennsylvania public policy by terminating his employment in retaliation for his filing a prior lawsuit alleging violations of the WPCL. Informatica first requests summary judgment on this count on the grounds that Pennsylvania law does not recognize a claim for wrongful discharge of an employee who has filed

a WPCL claim. Def.'s Br. Supp. (Docket No. 48) at 4-5. Plaintiff agrees that the Pennsylvania Supreme Court has not yet acknowledged this cause of action but argues that the Court would recognize such a claim if presented with the issue. Pl.'s Br. Opp. (Docket No. 53) at 3-6. After careful consideration, I cannot find that Donaldson's theory supports a cause of action for wrongful discharge under Pennsylvania law.

Federal courts sitting in diversity must apply the substantive law of the state whose laws govern the action, in this case Pennsylvania. Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide the case. Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45-46 (3d Cir. 2009). To accomplish this task, the court "'must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue,' as well as to 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008) (quoting Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996)). In undertaking this analysis, the federal court "should not accord to any particular 'datum' more significance than would the Pennsylvania Supreme Court under similar circumstances. Decisions of intermediate appellate courts of the state, while not conclusive, are indicia of how the state's highest court might decide the issue. In appropriate circumstances, such decisions may constitute 'presumptive evidence' of state law." McGowan v. Univ. of Scranton, 759 F.2d 287, 291 (3d Cir. 1985) (citations omitted); see also Borse, 963 F.2d at 614 (same).

Here, the Pennsylvania Supreme Court has neither expressly accepted nor expressly rejected a public policy wrongful discharge claim based on the WPCL. Thus, in accordance with

7

the above standards, I must predict how that Court would rule on this issue. In light of the extreme narrowness of the public policy exception to at-will employment and after careful review of the submissions of the parties, the WPCL, and relevant caselaw, I am not persuaded that the Pennsylvania Supreme Court would expand the exception to cases such as this where an employer allegedly discharges an employee in retaliation for filing a lawsuit under the WPCL.

In Pennsylvania, an employer generally may discharge an at-will employee such as Donaldson "with or without cause, at pleasure." Shick v. Shirey, 716 A.2d 1231, 1233 (Pa. 1998); see also Geary v. U.S. Steel Corp., 319 A.2d 174, 176 (Pa. 1974) ("Absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason."); Krajsa v. Keypunch, Inc., 622 A.2d 355, 358 (Pa. Super. Ct. 1993) ("[A]n at-will employee may be terminated for good reason, bad reason, or no reason at all."); Greishaw v. Base Mfg., Civ. A. No. 06-184 Erie, 2008 WL 509077 (W.D. Pa. Feb. 21, 2008) ("It is undisputed that Pennsylvania law generally does not recognize a common law cause of action for the wrongful discharge of an at-will employee."). The presumption of at-will employment is strong, and an employee may bring a cause of action for a termination of that employment "only in the most limited circumstances, where the termination implicates a clear mandate of public policy." Weaver v. Harpster, 975 A.2d 555, 563 (Pa. 2009). A "clear mandate" of public policy must be of a type that "strikes at the heart of a citizen's social right, duties, and responsibilities." Novosel v. Nationwide Ins. Co., 721 F.2d 894, 899 (3d Cir. 1983). As the Pennsylvania Supreme Court recently explained:

> In our judicial system, the power of the courts to declare pronouncements of public policy is sharply restricted. Rather, it is for the legislature to formulate the public policies of the Commonwealth. The right of a court to declare what is or is not in accord with public policy exists "only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it." Only in the clearest of cases may a court make public policy the basis of its decision. To determine the public policy of the Commonwealth, we examine the precedent within Pennsylvania, looking to our own Constitution, court decisions, and statutes promulgated by our legislature.

8

Weaver, 975 A.2d at 563 (quoting Mamlin v. Genoe, 17 A.2d 407, 409 (Pa. 1941)).

Consistent with this restrictive view, Pennsylvania courts have recognized public policy exceptions to at-will employment sparingly and only "where the wrongful discharge claims have involved infringements on statutory and constitutional rights." Id. Indeed, although there is a line of Pennsylvania Supreme Court cases addressing the public policy exception,[3] the Court has directly found such an exception in only two circumstances, both involving workers' compensation claims. In Shick v. Shirey, 716 A.2d 1231 (Pa. 1998), the state Supreme Court recognized a narrow public policy exception for an employee alleging wrongful discharge for seeking workers' compensation benefits. Seven years later in Rothrock v. Rothrock Motor Sales, Inc., 883 A.2d 511 (Pa. 2005), the Court held that the same public policy prohibits employers from terminating a supervisory employee for refusing to dissuade a subordinate from filing a workers' compensation claim. Id. at 516 (noting that otherwise "the policy of protecting subordinate employees' rights to seek WC benefits will be well-nigh eliminated").

In addition, the Pennsylvania Superior Court has found a cause of action for wrongful discharge in a handful of other cases, including where employees are fired for: refusing to submit to a polygraph test; serving on a jury; or filing an unemployment compensation claim. See Weaver, 975 A.2d at 562-64 (citing cases). When the termination does not implicate a clear mandate of public policy, the courts have not permitted a common law claim for wrongful discharge. See id. at 564 (citing numerous cases finding no cause of action). These limited instances "demonstrate Pennsylvania's traditional view that exceptions to at-will employment should be few and carefully sculpted so as not to erode an employer's inherent right to operate its business as it chooses." Id. at 563.

---

[3] The line of Pennsylvania Supreme Court cases begins with Geary v. U.S. Steel Corp., 319 A.2d 174 (Pa. 1974), and continues with: Clay v. Advanced Computer Applications, 559 A.2d 917 (Pa. 1989); Paul v. Lankenau Hosp., 569 A.2d 346 (Pa. 1990); Shick v. Shirey, 716 A.2d 1231 (Pa. 1998); McLaughlin v. Gastrointenstinal Specialists, Inc., 750 A.2d 283 (Pa. 2000); Rothrock v. Rothrock Motor Sales, Inc., 883 A.2d 511 (Pa. 2005); and Weaver v. Harpster, 975 A.2d 555 (Pa. 2009).

In its only opinion that addresses the public policy exception to at-will employment in the context of complaints about wages due, the Pennsylvania Superior Court declined to find a cause of action. See Booth v. McDonnell Douglas Truck Servs., 585 A.2d 24 (Pa. Super. Ct.), appeal denied, 597 A.2d 1150 (Pa. 1991). In Booth, the plaintiff complained that his employer fired him to avoid paying him commissions that he believed he was owed. Booth argued, *inter alia*, that his discharge violated public policy embodied in the WPCL because the WPCL provides statutory protection to the compensation due employees under their contract with the employer. Id. at 28. The Superior Court rejected this argument, stating that although the WPCL applied to protect the commissions Booth earned prior to his discharge, the discharge did not prevent him from enforcing those contract rights as evidenced by the fact that his claims for commissions due remained in the case. See id. ("We can agree that individuals have a public policy right to enforce their contracts. We do not understand how such a right is infringed by Booth's discharge."). As the Superior Court summarized:

> To adopt Booth's position would mean that any time an employee is discharged due to a dispute over compensation due him, the employer would be liable because it asserted its position. It is true that [an employee] has a right to attempt to enforce the contract as he sees it. It is just as true that [the employer] has [a] right to resist what it views to be overreaching by [the employee]. [The employer] has another right: to discharge . . . an at-will employee . . . for no reason or any reason. We refuse to hold that an employer who exercises that right because of a dispute over compensation due the employee is liable for wrongful discharge.

Id. at 29.

Federal district courts within the Third Circuit have ruled similarly in comparable cases. For example, in Greishaw v. Base Manufacturing, Civ. A. No. 06-184 Erie, 2008 WL 509077 (W.D. Pa. Feb. 21, 2008), the district court rejected the plaintiff's argument that his termination for complaining about his employer's alleged failure to comply with the WPCL represented a violation of public policy sufficient to support a wrongful discharge claim under Pennsylvania law. Id. at *5. Citing Booth and other cases, the Greishaw court agreed that none of Pennsylvania's

10

recognized narrow public policy exceptions were present in the case and that a "wrongful termination claim would not lie based upon a dispute for a claim arising under the WPCL." Id. at **6-7; see also, e.g., Redick v. Kraft, Inc., 745 F. Supp. 296, 304 (E.D. Pa. 1990) ("[W]hile the policy in favor of paying one what he has earned is highly desirable, it is not one that 'strikes at the heart' of our social structure."); Greto v. Radix Sys., Civ. A. No. 93-6910, 1994 WL 719646, at *3 (E.D. Pa. Dec. 22, 1994) (declining to expand public policy exception to case in which employee alleged retaliatory discharge for bringing WPCL suit for sales commissions).

Donaldson argues that his case is distinguishable because, unlike the employees in the cases cited above, he is not claiming that his employment was terminated because he complained to Informatica about commissions or wages allegedly due, but because he exercised his legal right to file a lawsuit under the WPCL based on nonpayment of such commissions or wages. See Pl.'s Br. Opp. at 5 ("Plaintiff has asserted a claim that he was discharged by Defendant, not for disputing his wages, but for *asserting his statutorily created right under the WPCL*."). In support, Donaldson relies on Fialla-Bertani v. Pennysaver Publications of Pa., Inc., 45 Pa. D. & C.4th 122 (Pa. Ct. Comm. Pl. 2000), in which the Allegheny County Court of Common Pleas recognized "wrongful discharge in retaliation against an employee who files a lawsuit to collect wages under the WPCL" as a valid cause of action. Id. The Fialla-Bertani court distinguished such a case from cases like Booth in which an employee was discharged by his employer after complaining but before filing a lawsuit. Id. (stating that the "crucial distinction" was that, unlike in Booth, the plaintiff in the case before it "was fired for exercising her right to have her dispute resolved in a court of law"). Citing the Pennsylvania Supreme Court's decision in Shick, the court analogized WPCL retaliation cases to cases involving workers' compensation claims, stating that "[a] claim pursuant to the WPCL is substantially similar to a workers' compensation claim" because "[b]oth claims provide a statutory remedy by which an employee may seek redress for wrongs committed by the employer." Id. The court further declared that

"[j]ust as the Pennsylvania Supreme Court has determined that there is a strong public policy favoring an employee's right to be compensated for work-related injuries [in Shick], there is also a strong public policy in favor of an employee's right to receive the wages that her employer promised to pay. Thus, in this case, plaintiff has alleged a valid cause of action – wrongful discharge in retaliation against an employee who files a lawsuit to collect wages under the WPCL." Id. For the reasons set forth below, however, the Fialla-Bertani court's reasoning is flawed and unpersuasive.

In addition to the fact that Fialla-Bertani is a decision of the Common Pleas Court and, as such, is not binding authority, the court's analysis in its short opinion is both cursory and conclusory. Significantly, the Fialla-Bertani court simply declares, by analogy and without citation, that there is a strong public policy in favor of an employee's right to receive the wages that her employer promised to pay. This unsupported declaration is contrary to the Pennsylvania Supreme Court's direction that courts must examine the law at issue and precedent within the Commonwealth to find a clear mandate of public policy. See Shick, 716 A.2d at 1237 ("Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." (quoting Hall v. Amica Mut. Ins. Co., 648 A.2d 755, 760 (Pa. 1994)).[4]

To the extent the Fialla-Bertani court conflates wrongful discharge in the WPCL context with Shick and the workers' compensation wrongful discharge line of cases, such a comparison is also misplaced. Contrary to the pronouncement of the court in Fialla-Bertani, the essence of Shick was not simply "that public policy prohibits an employer from terminating an employee as punishment for that employee's exercising a statutory remedy against the employer." Rather, in

---

[4] Although, as Donaldson notes, the district court in Janis v. La-Z-Boy Furniture Galleries, No. Civ. A. 05-2410, 2006 WL 724157, *8 (E.D. Pa. Mar. 17, 2006), cited the holding in Fialla-Bertani, the court did not rely on that holding in reaching its conclusion that the plaintiff in the case before it had not stated a claim for wrongful discharge in violation of public policy for complaining about sales commissions. Because the plaintiff in Janis had not filed a WPCL lawsuit and thus did not fall within the Fialla-Bertani exception, the court did not need to address the soundness of the Fialla-Bertani opinion.

12

finding a clear mandate of public policy, the Shick court focused on the nature of the Workers' Compensation Act itself, including the fact that the Act creates a substantive duty in the employer to compensate employees for work-related injuries and a substantive right in the employee to receive such compensation. Shick, 716 A.2d at 1237 (citing Frampton v. Cent. Ind. Gas Co., 297 N.E.2d 425, 427 (Ind. 1973)). The Supreme Court also focused on the fact that "[t]he Workers' Compensation Act is the exclusive means for obtaining compensation for injuries which has been substituted for common law tort actions between employees and employers. The Act restricts the remedies available to an employee for injuries sustained in the course of employment and closes to the employee any recourse against the employer at common law for negligence." Id. (citations omitted). The Shick court noted that the Workers' Compensation Act reflects a compromise between employees and employers: "employees receiving immediate set benefits as opposed to the potentially greater benefits which could result from a successful tort action; and employers being protected from exorbitant unexpected costs which could result from employee lawsuits." Id. (quoting Kachinski v. Workmen's Comp. Appeal Bd., 532 A.2d 374, 377 (Pa. 1987)). The court stated that "[t]his historical balance would be disrupted if the employer could terminate an employee for filing a workers' compensation claim." Id.

The WPCL does not share these key characteristics with the Workers' Compensation Act. Among other things, it is well-established that the WPCL does not create a substantive right to compensation, but rather provides a statutory remedy when an employer breaches a contractual obligation to pay earned wages. See DeAsencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003). The WPCL also is not an employee's exclusive remedy for obtaining wages allegedly due. See Grieshaw, 2008 WL 509077 (distinguishing WPCL actions from those involving the Workers' Compensation Act because, *inter alia*, unlike the WPCL, the Workers' Compensation act is the *exclusive* means for obtaining compensation for workplace injuries). In addition, as another district court within this Circuit has observed, "[c]ourts that allow claims for retaliatory

13

discharge for filing workers compensation claims do so because of the special 'humanitarian' nature of the Worker's Compensation Act." Greto, 1994 WL 719646, at *3 (citing Burns v. United Parcel Serv., Inc., 757 F. Supp. 518 (E.D. Pa. 1991)). Donaldson does not cite any authority suggesting that the same policies are embodied in or would extend to the WPCL.[5]

Other state courts analyzing similar wage payment and collection statutes have similarly found that the public policy underlying the exception in workers' compensation cases does not extend to the wage payment context. As the Supreme Court of Nebraska explained:

> [T]he Nebraska Wage Payment and Collection Act is largely remedial in nature and provides specific procedures for the enforcement of substantive rights to compensation for work performed that arise not from the statute but from the employment relationship itself. The Nebraska Workers' Compensation Act, however, creates a range of substantive rights that arise from the statute itself. Unlike the Nebraska Wage Payment and Collection Act, the general purpose and unique nature of the Nebraska Workers' Compensation Act itself provides a mandate for public policy. . . .
>
> Thus, unlike the Nebraska Wage Payment and Collection Act . . . , the Nebraska Workers' Compensation Act is unique because of its overriding purpose and the substantive rights it creates for employees.

Jackson v. Morris Commc'ns Corp., 657 N.W.2d 634, 639-640 (Neb. 2003) (allowing claim for wrongful discharge in retaliation for filing a workers' compensation claim); see also Malone v. Am. Bus. Info., 634 N.W.2d 788 (Neb. 2001) (pre-Jackson case finding no cause of action in retaliation for exercising rights under Nebraska Wage Payment and Collection Law); Trosper v. Bag 'N Save, 734 N.W.2d 704, 707-08 (Neb. 2007). The Appellate Court of Illinois similarly described this distinction in a case alleging retaliatory discharge for filing a wage payment lawsuit:

---

[5] Donaldson's comparison of his claim to retaliatory discharge claims in the unemployment compensation context is similarly misplaced. The Pennsylvania Superior Court decisions that recognize a cause of action for wrongful discharge in retaliation for filing an unemployment compensation claim likewise focus on protecting the substantive right to unemployment compensation benefits that the Unemployment Compensation Law itself creates. See Highhouse v. Avery Transp., 660 A.2d 1374, 1377-78 (Pa. Super. Ct. 1995) (noting that the "[t]he right of an employee to receive unemployment compensation is a benefit granted by the Commonwealth" and that the "Unemployment Compensation Law was enacted to alleviate the hardships attendant upon unemployment"); see also id. (quoting the Unemployment Compensation Law's express declaration of public policy that, *inter alia*, "[e]conomic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of the Commonwealth" (citing 43 Pa. Stat. § 752)); Raykovitz v. K Mart Corp., 665 A.2d 833, 835 (Pa. Super. Ct. 1995) (same).

14

> [W]e disagree with plaintiff's contention that a claim pursuant to the IWPCA is analogous to a workers' compensation action to such an extent that it would be incongruous not to extend the tort of retaliatory discharge to discharges related to an employee's exercise of rights under the IWPCA. Actions pursuant to the IWPCA are distinguished from workers' compensation actions by the fact that the IWPCA provides a non-exclusive remedy for employees asserting wage claims. The fact that the Workers' Compensation Act acted to supplant employees' common law rights clearly played a role in the supreme court's decision to allow the tort of retaliatory discharge [for filing a workers' compensation claim].

McGrath v. CCC Info. Servs., Inc., 731 N.E.2d 384, 392 (App. Ct. Ill. 2000)[6]; see also Benders v. Bellows & Bellows, 515 F.3d 757, 766-67 (7th Cir. 2008) (citing McGrath).

In short, I find that Donaldson's attempt to distinguish retaliation for complaining to an employer about WPCL-protected wages from retaliation for actually filing a lawsuit under the WPCL is a distinction without a difference in this case.[7] Although Donaldson offers some limited support for his theory of recovery, that minimal support is non-binding and unpersuasive for the reasons set forth above. Given the opinion of the Pennsylvania Superior Court in Booth, as well as numerous federal district court and other state court opinions suggesting that the public policy exception to at-will employment does not extend to wage payment-related retaliatory discharge claims, I simply cannot find the unanimity of opinion required to find a clear mandate of public policy under Pennsylvania law.

### 2. **The Merits of Plaintiff's Wrongful Discharge Claim**

In light of my ruling that the Pennsylvania Supreme Court would not recognize the wrongful discharge claim set forth in Donaldson's Amended Complaint, it is unnecessary to

---

[6] In 2010, the Illinois legislature amended the Illinois Wage Payment and Collection Act to, *inter alia*, allow employees to file retaliatory discharge claims under the Act in civil court. See 820 ILCS 115/14 (2011). Rather than undermine McGrath, however, this amendment is consistent with the Pennsylvania Supreme Court's view that, absent a clear mandate, it is for the legislature to formulate the public policies of the Commonwealth.

[7] To the extent that Donaldson argues that the public policy at issue is actually his right of access to Pennsylvania courts, see Docket No. 65, at 5, Pennsylvania law does not support this proposition. See, e.g., Smith v. Neyer, Tiseo & Hindo, Ltd., Civ. A. No. 92-6799, 1993 WL 57653, at **4-5 (E.D. Pa. Mar. 1, 1993) (employee's "right of access to the courts" is not a public policy sufficient to support a wrongful discharge claim under Pennsylvania law).

address Informatica's remaining argument that the wrongful discharge claim fails on the merits. For the same reason, Informatica's motion to strike certain exhibits and charts Donaldson submitted relating to the merits of his claim is denied as moot.

### III. CONCLUSION

In light of the extreme narrowness of the public policy exception to at-will employment in Pennsylvania, and in the absence of authority from the Pennsylvania Supreme or Superior Courts supporting Donaldson's position, I cannot predict that the Pennsylvania Supreme Court would extend the public policy exception to employment at-will to this case. For this and all of the reasons set forth above, Donaldson has failed to state a claim for wrongful discharge in violation of public policy and Informatica's motion for summary judgment is granted. Informatica's motion to strike is denied as moot. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Lee A. Donaldson, | ) |
| Plaintiff, | ) |
| vs. | ) Civil Action No. 09-804 |
| Informatica Corporation, | ) |
| Defendant. | ) |

AMBROSE, Senior District Judge

**ORDER OF COURT**

AND NOW, this 31st day of May, 2011, after careful consideration of the submissions of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ordered that Defendant Informatica Corporation's Motion for Summary Judgment (Docket No. 47) is granted. It is further ordered that Defendant's Motion to Strike Certain Exhibits/Charts to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Docket No. 59) is denied as moot.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Senior U.S. District Judge